**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | |
|---|---|
| DATA LOGGER SOLUTIONS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No.: N20C-10-121-EMD |
| | ) |
| DIGI SMARTSENSE, LLC, and DIGI | ) |
| INTERNATIONAL, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

Submitted:  May 16, 2023
Decided: August 22, 2023

*Upon Defendants' Motion to Dismiss Plaintiff's Amended Complaint*
***DENIED as to Count III***

Krista M. Reale, Esquire, Margolis Edelstein, Wilmington, Delaware, Herbert W. Mondros, Esquire, Rigrodsky Law, P.A. Wilmington, Delaware. *Attorneys for Plaintiff Data Logger Solutions, LLC.*

K. Tyler O'Connell, Esquire, Barnaby Grzaslewicz, Esquire, Samuel E. Bashman, Esquire, Morris James LLP, Wilmington, Delaware, Eric C. Liebeler, Esquire, Kevin Kitchen, Esquire, Connor Shaull, Esquire, Stinson LLP, Minneapolis, Minnesota. *Attorneys for Defendants Digi SmartSense, LLC and Digi International, Inc.*

**DAVIS, J.**

## I.      INTRODUCTION

This is a breach of contract, quasi-contract, and torts action filed in this Court. Plaintiff,

Data Logger Solutions, LLC ("DLS") filed a complaint (the "Complaint"), alleging that

Defendants Digi SmartSense, LLC ("SmartSense") and Digi International, Inc. ("International")

(collectively, "Digi") breached an agreement by refusing to pay DLS commissions owed under

the agreement.[1] The parties filed cross-motions for partial summary judgment, and on January 5, 2022, the Court made a bench ruling denying both motions without prejudice.[2]

On January 3, 2023, DLS filed its Amended Complaint, asserting (i) Breach of Contract, (ii) Breach of Implied Covenant of Good Faith and Fair Dealing, (iii) Tortious Interference of a Contract, (iv) Fraud, (v) Promissory Estoppel, (vi) Punitive Damages, and (vii) Declaratory Relief.[3] On January 23, 2023, Digi filed its Motion to Dismiss Counts II through VII of Plaintiff's Amended Complaint (the "Motion").[4] On February 27, 2023, DLS filed its Answering Brief in Opposition of Defendants' Motion to Dismiss (the "Opposition").[5] On March 13, 2023, Digi filed its Reply Brief in Support of Their Motion to Dismiss Counts II Through VII of Plaintiff's Amended Complaint (the "Reply").[6]

The Court held a hearing on the Motion, the Opposition and the Reply on May 16, 2023. At the conclusion of the hearing, the Court granted the Motion as to Counts II, IV, VI and VII. The Court denied the Motion as to Count V. The Court took the Motion under advisement as to Count III.

For the reasons set forth below, the Motion is **DENIED** as to Count III.

## II. RELEVANT FACTS

### A. THE PARTIES

DLS is a Florida limited liability company law with its principal place of business in Florida.[7] "DLS is a certified woman-owned business, and authorized distributor of sensor technologies."[8] DLS represents leading manufacturers in the supply of environmental and cold-

---

[1] *See* Complaint, D.I. No. 1. ("Compl.").
[2] D.I. No. 79.
[3] D.I. No. 154.
[4] D.I. No. 157.
[5] D.I. No. 165.
[6] D.I. No. 171.
[7] Amended Complaint ("Am. Compl.") ¶ 28.
[8] *Id.* ¶ 29.

chain data logging solutions that used in food and pharmaceutical storage and distribution, laboratories, healthcare, and industry.[9]

International is a publicly owned Delaware corporation with its principal place of business in Minnetonka, Minnesota.[10] International is the corporate parent of its wholly-owned subsidiary, Smartsense.[11]

Temperature@lert ("Tempalert") was a Massachusetts company in the business of developing temperature and other environmental sensors which enabled companies to remotely monitor their facilities.[12] Tempalert used an internal salesforce as well as third-party resellers, such as DLS, who referred potential customers to Tempalert.[13] Tempalert was acquired by International in October 2017, and Tempalert was renamed Digi SmartSense, LLC.[14]

Smartsense is the successor in interest to all Tempalert's contractual obligations and liabilities.[15] Smartsense is a Delaware limited liability company.[16]

B. THE RESELLER AGREEMENT

On September 1, 2014, DLS and Tempalert entered into the Reseller Agreement (the "Agreement").[17] The Agreement obligates DLS, as the Reseller, to provide lead generation and strategic sales services to Tempalert.[18] Tempalert, in return, must compensate DLS for those services with commission payments based on sales from leads generated by DLS.[19]

The Agreement specifies that the parties agree to the following "Services":

---

[9] *Id.* ¶ 31.
[10] *Id.* ¶ 32.
[11] *Id.* ¶ 36.
[12] *Id.* ¶¶ 52-54.
[13] *Id.* ¶¶ 52-57.
[14] *Id.* ¶¶ 41-42.
[15] *Id.* ¶ 43.
[16] *Id.* ¶ 41.
[17] *Id.*, Ex. 1 (hereinafter "Agreement").
[18] *See* Agreement.
[19] *Id.*

1. Services. Commencing on [September 1, 2014], [Tempalert] hereby engages [DLS] as an independent contractor to render services set forth in Appendix A (the "Services") to [Tempalert] and its affiliates as hereinafter provided, and [DLS] hereby accepts such engagement, commencing on [September 1, 2014]. [DLS] shall not have any authority to bind or act on behalf of [Tempalert] or their respective affiliates, except as otherwise consented to by [Tempalert].[20]

As such, "under the Agreement, Digi engaged DLS as an independent contractor to render the services set forth in Appendix A to the Agreement, including, but not limited to 'Sales Generation' and 'First Level Support.'"[21] Appendix A to the Agreement provides:

1. *Services:* Reseller [(DLS)] agrees to perform and provide the following Services to [Tempalert]:

   a. Sales Generation: Identification of qualified leads (the "Qualified Leads") that may be interested in the Company's products, services and solutions, whether through a direct purchase or lease ("Purchased Items"). It is mutually agreed and understood that the Reseller's Qualified Leads shall be defined as an individual listed on Appendix B to this Agreement. This list may be updated from time to time by the Reseller [(DLS)].

   b. First Level Support: Reseller [(DLS)] will offer first level support to all of its Qualified Leads to include: Sales calls and presentations, upsells or change orders, agreement or contract renewals upon or near Completed Sales term, technical support, and directly or indirectly servicing the Qualified Lead with deployment sensor replacement/calibration service. . . .[22]

In addition to providing an outline for the Services included in the Agreement, Appendix A defines the procedures related to sales and QLs. Appendix A provides:

2. *Procedures:* Reseller [DLS] and [Tempalert] agree to the following procedures in rendering Services to [Tempalert]:

   a. Notice: For each specific Qualified Customer Lead, [DLS] will send an email to [Tempalert], detailing the name of each Qualified Lead, the opportunity details and timing of the introductory meeting/call.

   b. Acceptance of Qualified Lead:

---

[20] *Id.* ¶ 1.
[21] Am. Compl. ¶ 71.
[22] Agreement, Appendix A, ¶ 1.

4

      i.  [Tempalert] shall accept a Qualified Lead if Qualified Lead has not been previously identified or engaged by [Tempalert]. If [Tempalert] rejects a Qualified Lead, it shall provide a reason for its rejection to [DLS] in writing.

     ii.  [Tempalert] will send an email acknowledgement to [DLS] either accepting or rejecting the Qualified Lead within ten (10) business days. If no written acknowledgment from [Tempalert] is received by [DLS] within ten (10) business days from submission of the Qualified Lead, then the Qualified Lead will be deemed to have been accepted by [Tempalert].[23]

Appendix A also details the Commission structure in which Commission is payable to DLS based on Completed Sales.  Appendix A provides:

4. ***Commission:*** For each agreement for Purchased Items, [DLS] shall receive a recurring commission payment ("Commission") for the Completed Sale,[24] based on the following terms.
    a.  The Commission shall be payable and based on the invoiced sales amount of Purchased Items for the term of any agreement (the "<u>Payment Term</u>"). For the avoidance of doubt, [Tempalert] shall be liable for and pay to [DLS] a Commission on each agreement or contract entered into by [Tempalert] for Purchased Items with a Qualified Lead (i.e., if multiple agreements or contracts, or renewed agreements or contracts, are entered into between [Tempalert] and a Qualified Lead then a Commission shall be payable on each agreement and contract). The Commission shall be paid over the entire Payment Term even if this Agreement is terminated. . . .[25]

Appendix B to the Agreement provides the original list of QLs as required by Appendix A, paragraph 1.a. Appendix B provides:

---

[23] *Id.* Appendix A, ¶ 2.
[24] Completed Sale is defined as "[c]ommencing on [September 1, 2014], a 'Completed Sale' shall be deemed to have been made and Commission shall be deemed to be due on the date that the Qualified Lead has paid [Tempalert] for same Purchased Items." *Id.* Appendix A, ¶ 3.
[25] Agreement, Appendix A, ¶ 4.

**Appendix B**

**Qualified Leads-Data Logger Solutions, LLC**

| | Companies | Qualified Lead |
|---|---|---|
| 1. | Harlan Stillions, Medtronic Inc. | Yes |
| 2. | Larry Rubin, Cleveland Clinic | Yes |
| 3. | Dr. John Petre, Cleveland Clinic | Yes |
| 4. | Ed Bennett, Frontier Paper Co (Potential Tier II Reseller) | |
| 5. | Scott Durbin, Frontier Paper Co (Potential Tier II Reseller) | |
| 6. | Michael MacNaughton, Frontier Paper Co (Potential Tier II Res) | |
| 7. | | |

### C. TERMINATION

The Agreement permits termination; however, the Agreement details how Commissions are to continue after termination. The Agreement provides:

> 3. <u>Termination.</u> This Agreement may be terminated by either Party for any reason upon thirty (30) days' written notice. Upon termination of this Agreement, [DLS] will promptly return any sample products. Upon termination this Agreement shall become void and have no further force and effect, except that covenants and agreements set forth in paragraphs 5, 7, 9, 12 and 14 in the Agreement,[26] and paragraph 4 in Appendix A,[27] shall survive such termination indefinitely. For the avoidance of doubt, paragraph 4 in Appendix A describes the continuing Commissions owed to [DLS] after termination of this Agreement.[28]

DLS and Smartsense operated under the Agreement beginning on September 1, 2014.[29]

On March 8, 2019, Smartsense sent DLS a letter, terminating the Agreement effective April 8, 2019 pursuant to the Agreement paragraph 4.[30]

---

[26] These paragraphs include: mutual indemnification, successors and assigns, governing law, notice, and counterparts. *Id.* ¶¶ 5, 7, 9, 12, 14.

[27] Paragraph 4 in Appendix A is the Commission structure for the Agreement.

[28] Agreement ¶ 4.

[29] Am. Compl. ¶ 268.

[30] *Id.*

### D. THE WALMART CONTRACT

In September 2014, DLS indicated to Tempalert's Jeremy McDonald that Walmart was potentially interested in purchasing Tempalert's products and services.[31] Following a trial run in a limited number of Walmart locations, in September 2015, Walmart and Tempalert entered into an agreement for temperature monitoring goods and related subscription services.[32] On July 31, 2016, Walmart agreed to placement of Tempalert products in nearly 5,000 of its locations in the United States and Puerto Rico, including Sam's Club locations.[33]

From the time Tempalert and Walmart began their business relationship in September 2015 to September 2020, there was no written contract between Tempalert/Smartsense and Walmart. Consequently, all business between the parties were conducted pursuant to an oral agreement.[34]

Due to the scope of the agreement and Walmart's needs, "Walmart engaged a third-party vendor, Loeb Electric ("Loeb"), to act as an intermediary between it and Tempalert or Smartsense."[35] "Under this arrangement, i) Walmart would place an order for Tempalert or Smartsense goods through Loeb; ii) Loeb would transmit that order to Tempalert or Smartsense; iii) Tempalert or Smartsense would ship its goods directly to Walmart and send an invoice for its goods to Loeb; iv) Loeb would pay Tempalert or Smartsense for the goods purchased by Walmart; v) Loeb would invoice Walmart for its payments to Tempalert or Smartsense, including an upcharge to cover Loeb's services; and vi) Walmart would pay Loeb."[36]

---

[31] *Id.* ¶ 101.
[32] *Id.* ¶ 111.
[33] *Id.* ¶ 117.
[34] *Id.* ¶¶ 119 – 120.
[35] *Id.* ¶ 123.
[36] *Id.* ¶ 124.

Tempalert requested that DLS's commission rate for the Agreement be modified for the Walmart deal from the standard 15%, to 8% for all Walmart locations, except for Walmart locations in Texas and Rhode Island where the rate would remain 15%, and Walmart locations in Oregon and Massachusetts where the rate would be lowered to 10%.[37]  Additionally, when DLS became aware that they were not receiving commissions from Tempalert's business with Sam's Club, Tempalert requested DLS waive its right to commissions on the revenue Tempalert received from the Sam's Club locations because Tempalert received "lower than expected margins with negotiations and did not desire to go back and attempt to amend its agreement with Sam's Club."[38]  DLS, "acting in good faith as a contract partner, and relying on the expectancy of Tempalert's continued to good faith," agreed to both concessions.[39]

Between July 2015, and March 1, 2018, Tempalert paid DLS nearly $500,000 in commission payments.[40]  DLS states that most of the commission payments came from the revenue Tempalert received from Walmart.[41]

### E.  INTERNATIONAL'S ACQUISITION OF TEMPALERT, AND THE TERMINATION OF THE AGREEMENT

On October 20, 2017, International acquired Tempalert for $45 million plus future earn out incentives.[42]  Tempalert was then reorganized as Smartsense, a wholly owned subsidiary of International.[43]  Smartsense retained all of Tempalert's customers, including Walmart.[44]  Following the acquisition, International set the strategic and financial goals for Smartsense, and

---

[37] *Id.* ¶¶ 127-128.
[38] *Id.* ¶ 129.
[39] *Id.*
[40] *Id.* ¶ 132.
[41] *Id.*
[42] *Id.* ¶ 136.
[43] *Id.* ¶¶ 146-147.
[44] *Id.* ¶ 149.

provided financial, accounting, HR, and legal services to Smartsense.[45]  International also determined the amount of commission payments to be made to DLS and the commission payments were made directly by International.[46]

In May 2018, correspondence between and among senior executives of International suggests that they were not aware of the existence of the Agreement between Smartsense and DLS.[47]  International executives expressed surprise at the open-ended and indefinite nature of the Agreement and the 15% commission rate which was perceived as higher than usual.[48]  While DLS continued to send leads for potential new customers to Smartsense, Digi's commission payments to DLS were "habitually late, and made only after [DLS] made multiple inquiries as to the status of those payments."[49]

In 2018, the business between Smartsense and Walmart expanded, with the two parties entering into several renewed and multiple contracts for sale of Smartsense's temperature monitoring goods and services.[50]  However, DLS was not made aware of the new agreements made between Smartsense and Walmart, which included a May 2018 purchase order worth $2.5 million to supply ambient humidity sensors and NIST calibrations for all 4,657 Walmart stores.[51]  Smartsense and Walmart personnel, including John Davidson (the original Walmart Qualified Lead referred to Tempalert in 2015), continued to meet throughout 2018 and 2019 regarding the ongoing business between the two companies.[52]

---

[45] *Id.* ¶¶ 151-154.
[46] *Id.* ¶ 153.
[47] *Id.* ¶ 190.
[48] *Id.* ¶¶ 198-200.
[49] *Id.* ¶¶ 206-211.
[50] *Id.* ¶ 220.
[51] *Id.* ¶¶ 220-222. NIST calibration is a certification of equipment to industry standards of the National Institute of Standards and Technology. At the time the purchase order was made, Smartsense and Walmart was still doing business under the same oral contract that governed the business between the two parties originally. *Id.* ¶ 224.
[52] Am. Compl. ¶ 231.

Following the May 2018 purchase order, despite the Agreement prohibiting such discussions with Walmart without obtaining DLS's approval, Digi and Walmart entered negotiations for a formal written contract without the knowledge of DLS or Loeb.[53] The negotiations resulted in Digi and Walmart entering into the Master Service Agreement on September 21, 2020.[54]

In November 2018, International's accountants recognized the discrepancy between the Agreement's unilateral 15% commission rate, and the "napkin" agreements made between DLS and Tempalert lowering the commission rates for the Walmart business.[55] After discovery of the modification, International rejected the "napkin" deal, and determined that the commission should return back to 15% as per the language of the Agreement.[56] However, on December 18, 2018, International reversed their decision to return to the 15% commission rate, and imposed a unilateral 8% commission rate for all revenue Smartsense received from Walmart.[57] International informed DLS of the unilateral change made to the commission rate on February 1, 2019 following DLS's repeated inquiries as to discrepancies in the commission payment amounts.[58] The dispute over the discrepancies in the owed commission amounts was never resolved prior Smartsense's letter to DLS on March 8, 2019 informing DLS that Smartsense was triggering the termination clause of the Agreement, with the effective termination date of April 9, 2019.[59]

---

[53] *Id.* ¶ 235.
[54] *Id.* ¶ 242.
[55] *Id.* ¶ 245.
[56] *Id.* ¶ 251.
[57] *Id.* ¶ 253.
[58] *Id.* ¶¶ 255-256.
[59] *Id.* ¶ 268.

On March 15, 2019, DLS sent Smartsense a letter in response to the Termination Letter, requesting reimbursements for expenses related to a tradeshow and ongoing commissions.[60] The March 15, 2019 letter provides in part:

> Pursuant to sections 4 of the Termination and Appendix 4(a) of the Reseller Agreement, DIGI remains obligated for all sales, current and future, from sales leads that [DLS] provided. A list of the current customers is enclosed and we will update the list through April 8, 2019, as additional sales projects are pending. To our knowledge, we have outstanding estimated commissions, to bring us current to date:
> Walmart 2-year sensors      $211,000.00
> Walmart Software and Cell    $171,337.00
> Walmart 4G Upgrade         $111,792.00
> FastMed if Upgrade          $   4,945.00
> FastMed with NextCare      $ 21,150.00[61]

Digi [Smartsense and International] failed to respond to DLS's March 15, 2019 letter.[62] DLS sent an email on April 14, 2019 to Digi's President of IOT Solutions, Kevin Riley, to follow up on the March 15, 2019 letter.[63] In the April 14, 2019 email, DLS attached the QL Sheet through April 8, 2019 and requested Digi "update the accounting office with this list of leads for future commission calculations."[64] The updated QL Sheet dated April 4, 2019 included Walmart QLs: Gary Campisi, Kevin Jones, and John Davidson.[65]

DLS continued to follow up with Digi as to the outstanding commission payments due to DLS but did not receive any responses. When DLS wrote to Digi on July 12, 2019 inquiring about the outstanding commissions related to Walmart, an International accountant, Melissa Hyunh, forwarded the inquiry to Kevin Riley, International's COO and President of Smartsense, who responded to Ms. Hyunh that Smartsense had already paid everything due to DLS, and that

---

[60] *Id.* ¶ 281.
[61] Am. Compl. ¶ 281. Ex. 32, Dep. Ex. 71.
[62] *Id.* ¶ 282.
[63] *Id.* ¶ 285.
[64] *Id.* ¶ 285. Ex. 2.
[65] *Id.* Ex. 2.

Smartsense has not transacted in any business with Walmart since September of 2018, stating "They have been paid everything due; we have not transacted anything else with Walmart post September."[66] Ms. Hyunh forwarded Kevin Riley's email response to DLS.[67]

On December 6, 2019, Kevin Riley of International/Smartsense, and Vikki Lisec of DLS held a call, where Kevin Riley stated that he would send Smartsense's final reconciliation of all of its commissions due under the Agreement.[68] Later that day, Kevin Riley sent an email, proposing a commission payment totaling $110,969.64 to constitute a "full and final payment of any amounts due under the Reseller Agreement and acknowledgment of the termination of the agreement and the satisfaction of all obligations and liabilities on behalf of both parties."[69] The email included a 19-page worksheet which provided Digi's calculations for the owed commissions.[70] The worksheet evinced that despite Digi's prior representations that they did not transact any business with Walmart after September 2018, the worksheet showed that there were hundreds of separate transactions involving Walmart and Loeb.[71] To date, DLS has not received the $110,969.64 commission payment as calculated by Digi.[72]

## F. THE MASTER SERVICE AGREEMENT[73]

Smartsense and Walmart entered into the MSA on September 21, 2020 which governed all business between the two parties. While the MSA was executed on September 21, 2020, the effective date of the MSA was backdated to December 1, 2018.[74] "[DLS] did not learn that

---

[66] *Id.* ¶¶ 293 – 296.
[67] *Id.* ¶ 301.
[68] *Id.* ¶ 312.
[69] *Id.* ¶ 313. Ex. 39, Dep. Ex. 27.
[70] *Id.* ¶ 334.
[71] *Id.* ¶ 335.
[72] *Id.* ¶ 336.
[73] A copy of the Master Service Agreement ("MSA") can be found at Am. Compl. Ex. 40.
[74] Am. Compl. ¶ 243.

Smartsense and Walmart had signed the MSA on September 21, 2020 and backdated it to December 1, 2018, until discovery in the instant litigation, long after this litigation was filed."[75]

### G. THE CROSS-MOTIONS FOR SUMMARY JUDGMENTS

In October 2021, the parties filed cross-motions for partial summary judgment.[76] Digi moved for summary adjudication, or in the alternative, partial summary judgment regarding the definition of the term, "Qualified Lead" ("QL"), asking the Court to define a QL as a specific individual, rather than a company or other business entity. DLS filed its motion asking the Court to find that (i) Digi is required to pay commissions to DLS on all revenue Digi received from QLs before termination of the Reseller Agreement; (ii) Digi is required to pay commissions to DLS indefinitely on all revenue received from QLs after termination of the Reseller Agreement; and (iii) Digi is required to pay commissions to DLS indefinitely on all revenue received from QLs on all contract renewals and all additional contracts between Digi and those QLs.[77]

On January 5, 2022, the Court denied both motions, finding that there were genuine issues of material fact relating to whether Section 4 and Appendix 4(a) applied to the ongoing contractual relationships between Digi and its clients, such as Walmart, and whether the relationships were the product of a QL provided by DLS. The Court observed that the Agreement was clear on its face as to the definition of a QL, stating, "I don't think qualified lead means a corporation. I think it means a person from a corporation from which you get an agreement" and the surviving obligation of Digi to pay commissions to DLS for any existing "Payment Term" arising out of a QL.[78]

---

[75] *Id.* ¶ 354.
[76] D.I. Nos. 64, 68, 69.
[77] DLS's Opening Brief in Support of its Motion for Partial Summary Judgment, at 3-4. [D.I. No. 70].
[78] MSJ Hearing Tr. 12.

In turn, the Court found that if there are multiple contracts between Digi and a company, such as Walmart, DLS was only entitled to commissions from contracts arising out of QLs provided by DLS to Digi. In other words, DLS could not point to the general ongoing contractual relationship between Digi and Walmart and argue that they are entitled to commissions on all the contracts just because the overall business relationship originated from the Walmart QLs provided to Digi. DLS must show that the existing contracts arose out of the QLs to receive commissions on them. As such, the Court denied both motions without prejudice.[79]

Subsequently, on January 3, 2023, DLS filed the Amended Complaint.[80]

## III.    STANDARD OF REVIEW

Upon a motion to dismiss, the Court (i) accepts all well-pled factual allegations as true, (ii) accepts even vague allegations as well-pled if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[81] However, the court must "ignore conclusory allegations that lack specific supporting factual allegations."[82]

In considering a motion to dismiss under Rule 12(b)(6), the court generally may not consider matters outside the complaint.[83] However, documents that are integral to or incorporated by reference in the complaint may be considered.[84] "If . . . matters outside the pleading are presented to and not excluded by the Court, the motion shall be treated as one for

---

[79] D.I. No. 79.
[80] D.I. No. 154.
[81] *See Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Academy*, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).
[82] *Ramunno v. Crawley*, 705 A.2d 1029, 1034 (Del. 1998).
[83] Super. Ct. Civ. R. 12(b).
[84] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 (Del. 1995).

summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."[85]

## IV. DISCUSSION

Under Delaware law, a claim for tortious interference with a contract requires plaintiffs to show: (i) a contract, (ii) of which the defendant knew, and (iii) an intentional act by the defendant that is a significant factor in causing the breach of such contract, (iv) without justification, and (v) causes injury.[86] The plaintiff has the burden of showing that the defendant acted "maliciously or in bad faith to injure plaintiff."[87]

Digi argues that Count III—the claim for tortious interference—should be dismissed on procedural grounds because it "comprises entirely different elements than a breach of contract claim" and thus does not relate back to the original breach of contract claim.[88] Digi contends that the new claim not only fails to relate back, but actually contradicts the original complaint and its sole breach of contract claim by alleging new facts and damage theories in the Amended Complaint.

Digi insists that DLS's factual allegations supporting the breach of contract claim in the original complaint did not put Digi on notice that DLS might bring a claim for tortious interference. Digi notes that the facts alleged by DLS in its breach of contract claim are wholly different than those alleged for the tortious interference claim, evincing the lack of a "relation back" to the Complaint.[89]

---

[85] Super. Ct. Civ. R. 12(b).
[86] *Bhole, Inc. v. Shore Investments, Inc.*, 67 A.3d 444, 453 (Del. 2013).
[87] *Id.*
[88] Digi's Motion to Dismiss ("Mot.") at 10.
[89] Digi's Reply Brief in Support of Motion to Dismiss ("Reply") at 7.

15

DLS argues that their claim for tortious interference relates back because Count III "arises from the exact same occurrence as plead[sic] in the Complaint" and as such, International was on notice that they could later be subject to a tortious interference claim arising from the same facts.[90] DLS relies on the Court's ruling in *Ashland v. Samuel J. Heyman*, where the Court stated that, "[w]hen the original complaint filed in the case gave notice to the defendant of all the facts which will be relied upon at the trial, the claim arises from the same occurrence described in the original complaint, and the plaintiff will rely on the same operative facts, then the amendment will relate back to the date of the original pleading."[91] DLS maintains that, while the original complaint improperly identified International as a party to the Agreement who then breached the Agreement, the fact that the present tortious interference claim alleges International as having induced Smartsense to breach the Agreement is based upon the same factual framework alleged in the Complaint.

The Court finds DLS's arguments persuasive on this issue. The Court acknowledges that a claim for a breach of contract and a claim for tortious interference of a contract are two different claims, with different elements. Under Delaware law, a claim for breach of contract comprises of three elements: i) a contractual obligation, ii) a breach of that obligation by the defendant, and iii) a resulting damage to the plaintiff.[92] In contrast, a claim for tortious interference with a contract requires plaintiffs to show: (i) a contract, (ii) of which the defendant knew, and (iii) an intentional act by the defendant that is a significant factor in causing the breach of such contract, (iv) without justification, and (v) causes injury.[93]

---

[90] Opp. at 14-16.
[91] *Id.* at 14 (citing *Ashland LLC v. Samuel J. Heyman 1981 Continuing Trust ex rel. Heyman*, 2018 WL 3084975, at *8 (Del. Super. June 21, 2018)).
[92] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).
[93] *Bhole*, 67 A.3d at 453.

16

In the original breach of contract claim, DLS claimed that International, together with Smartsense, refused to pay owed and ongoing commission payments to DLS. DLS initially alleged that International was a party to the Agreement. Now, DLS argues that International, the parent company allegedly exercising "control over nearly every aspect of Defendant Smartsense's discharge of its obligations under the [Agreement]," induced Smartsense to breach the contract and avoid payment of commissions. The present tortious interference claim (Count III) alleges International as having induced Smartsense to breach the Agreement is based upon the same factual context alleged in the Complaint. From the outset, DLS contended that International and Smartsense breached the Agreement. International is not a party to the Agreement; however, it is not unreasonable to foresee that a tortious interference claim would arise if a non-party (i.e., International) exercised enough control over a contracting party to cause a breach.

Viewing in the light most favorable to DLS as the non-moving party, and accepting even vague allegations as well-pled, the factual gap between the two claims is not insurmountable to find that Digi and International were provided sufficient notice necessary for the tortious interference claim to relate back. International, a non-party, could have logically expected a claim—like that made in Court III—when it allegedly interfered with the contractual relations between Smartsense and DLS.

17

## V. CONCLUSION

Now, therefore, it is ordered that the Motion is **DENIED** as to Count III.

**IT IS SO ORDERED.**

August 22, 2023
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc:    File&ServeXpress